# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

NANCY LORENE GALBREATH,      )
                                    )
        **Plaintiff,**        )
                                    )
**v.**                            )     **Case No. 10-CV-759-PJC**
                                    )
**MICHAEL J. ASTRUE, Commissioner of the**  )
**Social Security Administration,**      )
                                    )
        **Defendant.**      )

## OPINION AND ORDER

Claimant, Nancy Lorene Galbreath ("Galbreath"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance and supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Galbreath appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Galbreath was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

Galbreath was 58 years old at the time of the hearing before the ALJ on September 29, 2009. (R. 23). Galbreath had completed ninth grade and later obtained a GED. (R. 25). She had attended vocational school to be a nurse's aide. (R. 25-27). Galbreath had worked as a

housekeeper and as a receptionist. (R. 31-34). She said that she stopped working in September 2008 when her health problems interfered with her attendance at work. (R. 31, 33-34). She testified that she was disabled because of problems with her back, shoulders, blood pressure, vertigo, hypertension, and diabetes. (R. 34-44).

Galbreath testified that she quit working as a housekeeper because she had pain from bending and walking long periods. (R. 34-35, 40). She tried to ignore her chronic back and leg pain when she worked. (R. 34, 46). Her pain had increased to the point that she was no longer able to ignore it. (R. 45-46). Galbreath's pain made it difficult for her to sit for the continuous hours required to work as a receptionist. (R. 33-34). She believed the reason she was let go from the receptionist job was because she had missed too much work. (R. 33). She said that she had difficulty with her attendance at work because she was sick from problems with her blood pressure and from dizzy spells. (R. 33-34).

Galbreath testified that she had hardware implanted in her ankle that caused it to swell and caused her pain. (R. 39-40). Ankle pain made it difficult for Galbreath to stand and walk. *Id*.

Galbreath suffered back and shoulder pain because of deteriorated disks in her back. (R. 41, 43). She said that she was unable to lift her hands above her head because of shoulder pain. *Id*. Back pain made it difficult for Galbreath to sleep at night. (R. 41).

Galbreath had experienced symptoms of lightheadedness and had been diagnosed with hypertension. (R. 35-37). She experienced episodic occasions of lightheadedness two to three times a week. (R. 50). She became lightheaded when she went on walks or when she stood up too quickly. *Id*. She took blood pressure and diabetes medications, but she felt the medications were not helpful in controlling her symptoms. (R. 36-39).

At the hearing, Galbreath said that she was 5'11" and weighed 290 pounds. (R. 24). She said that she had "never been a small girl" and had always had difficulty managing her weight. (R. 24, 37). She felt that her weight could contribute to her symptoms of shortness of breath. (R. 51). She testified that, at the time of the hearing, she had recently quit smoking cigarettes and marijuana. (R. 27-29).

Galbreath testified regarding her physical capabilities. (R. 42-47). She said that she was able to walk a block before her back would lock up and her legs would hurt. (R. 42). Galbreath said that she would have to return home to lie down when she walked farther than a block. *Id.* She had to take a break after standing longer than 30 minutes because her back and legs would hurt. *Id.* Her back hurt if she sat for a period of more than 45 minutes. (R. 45). She had to move around after standing longer than 30 minutes or sitting longer than an hour. (R. 42, 44-45). After she moved around for five minutes, she was unable to go back to sitting for another 45 minutes because her back would continue to hurt. (R. 45). She said that she could only lift 10 pounds from the height of a table. (R. 43-44).

Galbreath testified that she spent most of her day lying on her bed, looking out the window, watching television, and playing solitaire. (R. 46-48). She was unable to get through the day without lying down. (R. 48). She had difficulty cleaning her two-bedroom apartment and doing the dishes, and she would take a 30-minute break. (R. 47). After she walked the distance of a block to get her mail, she had to sit down to rest before she returned home. (R. 42, 46-47). She took breaks if she cooked an elaborate meal. (R. 47). Galbreath said that she had to bend her head down to comb her hair because she was unable to lift her arms. (R. 43). She said that she needed help carrying her groceries. (R. 44). Galbreath became short of breath while taking her trash out. (R. 48).

Galbreath was treated at Hillcrest Medical Center ("Hillcrest") on October 9, 2002 for a right ankle fracture.  (R. 328-32).

Galbreath presented to the emergency room at Hillcrest on August 29, 2005 for pain in the middle of her chest.  (R. 205-09, 303-27).  She reported that an EKG test conducted earlier that day at Good Samaritan Clinic had been abnormal and she had been instructed to go to the emergency room for further evaluation.  (R. 307).  She reported symptoms of nausea, shortness of breath, heartburn, indigestion, and vomiting.  (R. 209).  She said that she had pain when she raised her arms.  (R. 309).  She reported that she had smoked ½ pack of cigarettes daily for 33 years.  (R. 209).  On examination, her chest was tender on palpation and with arm movement.  *Id.*  Doctors assessed Galbreath for myocardial infarction, hypertension, and hypokalemia.[1]  *Id.*  Results of an EKG test showed normal sinus rhythm and T-wave abnormalities.  (R. 327).  The doctor assessed the EKG test was abnormal and stated that he could not could not rule out ischemia.[2]  *Id.*  The doctor compared Galbreath's chest x-rays taken that day to x-rays taken on September 1, 2002 and concluded that Galbreath's heart was mildly enlarged.  (R. 205).  Galbreath was diagnosed with mild congestive heart failure.  *Id.*  She was discharged on August 31, 2005 with medications and instructions to eat a low-sodium diet.  (R. 207, 394-95).

Galbreath was transported via ambulance to Hillcrest's emergency room on September 20, 2008 for complaints of dizziness and weakness.  (R. 211-15, 295-302).  A CT brain scan revealed no acute intracranial abnormality.  (R. 218).  Galbreath's symptoms of acute vertigo had

[1]Hypokalemia is extreme potassium depletion in the circulating blood commonly manifested by episodes of muscular weakness or paralysis, tetany, and postural hypotension.  Taber's Cyclopedic Medical Dictionary 948 (17th ed. 1993).

[2]Ischemia is local and temporary deficiency of blood supply due to obstruction of the circulation to a part.  Taber's Cyclopedic Medical Dictionary 1024 (17th ed. 1993).

resolved prior to her discharge.  (R. 212).  She was diagnosed with hyperglycemia.  *Id.*

A November 6, 2008 EKG study showed that Galbreath had mild mitral and tricuspid regurgitation.  (R. 396-99).  Her aortic valve was normal for her age.  (R. 397).  It was concluded that Galbreath's global systolic function was normal.  *Id.*

Galbreath complained of chest pain at an appointment on January 27, 2009.  (R. 393). She additionally reported that she experienced frequent heart palpitations and shortness of breath with walking.  *Id.*  She was diagnosed with hypertension and chest pain with history of GERD.[3] *Id.*

OU Physicians Community Health ("OU Clinic") evaluated Galbreath on February 3, 2009 for lightheadedness, shortness of breath with exertion, and heart palpitations.  (R. 275-78). She reported that she had been taking short walks and had been eating healthy meals.  (R. 276). She was given medications to treat hypertension, hyperlipidemia,[4] and a pulmonary nodule.  (R. 278).

Galbreath continued to have complaints of shortness of breath with exertion at her February 24, 2009 appointment at the OU Clinic.  (R. 273-75).  Chest x-rays revealed she had a pulmonary nodule in her right lung.  (R. 391-92).  Galbreath was diagnosed with cardiomegaly,[5] morbid obesity, vertigo, hypertension, unspecified chest pain, GERD, and diabetes mellitus, type II, uncontrolled.  (R. 273).

---

[3] GERD is the abbreviation for gastroesophageal reflux disease.  Dorland's Illustrated Medical Dictionary 2142 (31st ed. 2007).

[4] Hyperlipidemia is an increase of the lipids in the blood.  Taber's Cyclopedic Medical Dictionary 936 (17th ed. 1993).

[5] Cardiomegaly is defined as hypertrophy of the heart.  Taber's Cyclopedic Medical Dictionary 313 (17th ed. 1993).

Galbreath had an elevated blood pressure reading at her March 10, 2009 appointment at the OU Clinic. (R. 270). She continued to report she had been walking daily and had been eating healthy meals. (R. 269). She was given continued diagnoses of hypertension, diabetes, hyperlipidemia, GERD, and allergic rhinitis. (R. 271).

Galbreath reported increased back and elbow pain during her appointment at the OU Clinic on May 11, 2009. (R. 383-88). She was scheduled for a lumbar spine MRI.

Galbreath presented to the OU Clinic on June 11, 2009 with complaints of recent hearing loss. (R. 375-79). Examination showed she had elevated blood pressure and elevated blood sugar readings. (R. 376).

The lumbar spine MRI was conducted on June 25, 2009. *Id*. Results showed that the L5-S1 disk had central extrusion and annular tear. (R. 389-90). The scan revealed mild canal stenosis and neural foraminal narrowing that was moderate on the right side and moderate to severe on the left side. (R. 389).

At Galbreath's appointment at the OU Clinic also on June 25, 2009 , she reported that her blood pressure readings had been high and that she had been experiencing headaches. (R. 370-73). She additionally reported that she had experienced frequent episodes of shortness of breath and occasional heart palpitations. (R. 371). She continued to have shock-like pain that radiated down her left leg and made her toes feel like they were burning. *Id*. She said that the pain occurred nightly and made it difficult for her to sleep. *Id*. She reported that she had been watching her diet and that her appetite had decreased. *Id*.

Galbreath's blood pressure remained elevated at a follow-up appointment at the OU Clinic on July 9, 2009. (R. 365-69). She complained of continued shortness of breath and headaches. (R. 366). She said that she had been unable to afford the strips to monitor her blood

sugar. *Id.* She reported that she had started smoking again. *Id.*

At Galbreath's appointment at the OU Clinic on August 14, 2009, she reported that she had been trying to quit smoking. (R. 359-63). She had a low blood pressure reading. (R. 360). She said that pain medication had helped, but it made her sleepy. *Id.*

Agency consultant G. Bryant Boyd, M.D. conducted an examination of Galbreath on December 23, 2008. (R. 228-235). Galbreath's weight was 296 pounds. (R. 234). Galbreath reported that she was disabled because of the effects of having lightheadedness. (R. 234-35). She told Dr. Boyd that she would feel lightheaded if she stood for long and would have to sit down. *Id.* She reported that she felt like she might faint when she was lightheaded, but that she had never fainted or lost her balance. *Id.* Galbreath reported that she was uneasy when she walked and stood because she was obese, and because she experienced symptoms of lightheadedness. (R. 235). Dr. Boyd filled out a Description of Chest Discomfort form and identified that Galbreath had episodes of several seconds of burning chest pain daily. (R. 232). He noted that walking precipitated Galbreath's chest pain, and that she received relief from her pain by lying down. *Id.* After his physical examination, Dr. Boyd concluded that Galbreath's gait was slowed because of her obesity, but he determined that she could walk safely and in a stable manner. (R. 233). Galbreath reported that she was unable to lift her arms above head. (R. 234-35). It was Dr. Boyd's impression that Galbreath had marked obesity; hypertension; diabetes; slight decreased range of motion in her shoulders, particularly trying to raise her hands directly over her head; and chest pain that he noted was not suggestive of coronary artery disease. *Id.*

As part of her disability case, Galbreath underwent pulmonary function testing at St. John's Hospital on January 5, 2009. (R. 236-41). Her spirometry test results were within normal

limits.  (R. 236).

A Physical Residual Functional Capacity Assessment was completed by agency nonexamining consultant Kenneth Wainner, M.D. on February 2, 2009.  (R. 260-67).  For Galbreath's exertional limitations, Dr. Wainner indicated that Galbreath could lift and carry 20 pounds occasionally and 10 pounds frequently.  (R. 261).  He found that she could stand or walk for 2 hours and sit for 6 hours in an 8-hour workday.  *Id.*  In the portion of the form calling for narrative explanation of these findings, Dr. Wainner summarized the findings of Dr. Boyd's consultative examination and Galbreath's spirometry test.  *Id.*  He stated that Galbreath would have a mild limitation on overhead work with both of her arms.  *Id.*  For postural limitations, Dr. Wainner indicated that Galbreath could never climb, could frequently balance, and could occasionally stoop, kneel, crouch, and crawl.  (R. 262).  For manipulative limitations, Dr. Wainner checked that none were established, and he stated that Galbreath's mild shoulder limitation of movement would not prevent overhead work.  (R. 263).  For environmental limitations, Dr. Wainner indicated that Galbreath should avoid concentrated exposure to fumes and should avoid all exposure to hazards due to her allegation of vertigo.  (R. 264).

Agency nonexamining consultant Thurma Fiegel, M.D. completed a second Physical Residual Functional Capacity Assessment on April 27, 2009.  (R. 285-92.)  Dr. Fiegel found the same exertional limitations as previously found by Dr. Wainner, but included additional explanation in the narrative section.  (R. 286).  Dr. Fiegel stated that Galbreath had only mild limitation on overhead work, and that there was no evidence of current congestive heart failure.  *Id.*  For postural limitations, Dr. Fiegel indicated that Galbreath could never climb ladders, but could occasionally climb stairs, balance, stoop, kneel, crouch, or crawl.  (R. 287).  For manipulative limitations, Dr. Fiegel stated that Galbreath could not reach overhead frequently.

(R. 288).  Galbreath needed to avoid concentrated exposure to hazards due to her allegation of vertigo.  (R. 289).

Agency consultant David Hansen, Ph.D., conducted a psychological evaluation on January 8, 2009.  (R. 242-44).  Galbreath told Dr. Hansen that she was disabled because she had hypertension, borderline diabetes, probable heart disease, morbid obesity, vertigo, and depression.  (R. 243).  She said that she was frequently short of breath, lightheaded, and hypertensive.  *Id.*  Galbreath reported that she had difficulty working because her hypertension and diabetes caused her to have dizzy spells and episodes of blurry vision.  *Id.*  She said that she sat all the time because she had no energy and could not keep her hands up long.  *Id.*  She reported that she smoked marijuana once weekly.  *Id.*  Dr. Hansen noted that Galbreath functioned independently in activities of daily living.  *Id.*  Galbreath reported that she performed her housework and went to her appointments.  *Id.*  Galbreath stated that she just tried "to make it through."  *Id.*  Dr. Hansen noted that Galbreath did not report any difficulty with her mood or mental status functioning.  (R. 244).  Dr. Hansen diagnosed Galbreath on Axis I[6] with cannabis abuse.  *Id.*  He recommended that Galbreath not manage her own money because of her use of cannabis.  *Id.*

Nonexamining agency consultant Hannah Swallow, Ph.D., completed a Psychiatric Review Technique form on January 30, 2009.  (R. 246-59).  She indicated that Galbreath's mental impairments were not severe.  (R. 246).  For Listing 12.04, Dr. Swallow marked that Galbreath had disturbance of mood evidenced by decreased energy, and for Listing 12.09, she

---

[6] The multiaxial system "facilitates comprehensive and systematic evaluation."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000).

marked behavioral changes associated with the regular use of substances that affect the central nervous system. (R. 246, 249, 254). For the "Paragraph B Criteria,"[7] Dr. Swallow found mild restriction of Galbreath's activities of daily living and mild difficulties in maintaining social functioning. (R. 256). She determined that Galbreath had no difficulty in maintaining concentration, persistence, or pace, and had no episodes of decompensation. *Id.* In the "Consultant's Notes" portion of her report, Dr. Swallow briefly summarized Dr. Hansen's report, and she listed Galbreath's activities of daily living.

**Procedural History**

Galbreath filed applications on October 6, 2008 seeking disability insurance benefits and supplemental security income benefits under Titles II and XVI, 42 U.S.C. §§ 401 *et seq*. (R. 107-17). Galbreath alleged onset of disability as September 10, 2008. (R. 111). The applications were denied initially and on reconsideration. (R. 57-69). A hearing before ALJ John W. Belcher was held September 29, 2009 in Tulsa, Oklahoma. (R. 22-56). By decision dated December 11, 2009, the ALJ found that Galbreath was not disabled. (R. 9-15). On October 7, 2010, the Appeals Council denied review of the ALJ's findings. (R. 1-3). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. §§ 404.981, 416.1481.

---

[7] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[8] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v.*

---

[8]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

**Decision of the Administrative Law Judge**

The ALJ found that Galbreath met insured status requirements through September 30, 2011. (R. 11). At Step One, the ALJ found that Galbreath had not engaged in any substantial gainful activity since her alleged onset date of September 10, 2008. *Id.* At Step Two, the ALJ found that Galbreath had severe impairments of hypertension, morbid obesity, and nicotine addiction. *Id.* The ALJ stated that Galbreath's borderline diabetes, coronary heart disease, mild left ventricular hypertrophy, congestive heart failure, vertigo, history of alcohol and cannabis use, hyperkalemia, GERD, hyperlipidemia, right ankle fracture, and depression were nonsevere impairments. (R. 11-12). At Step Three, the ALJ found that Galbreath's impairments did not meet any Listing. (R. 12).

In his RFC determination, the ALJ found that Galbreath had the RFC to perform sedentary work, including the capacity to stand or walk for a total of 2 hours and for 30 minutes at a time. (R. 12-13). He found that Galbreath could occasionally climb stairs, balance, stoop, bend, kneel, crouch, or crawl, and could not climb ladders or ropes. *Id.* At Step Four, the ALJ found that Galbreath could return to her past relevant work as a receptionist. (R. 15). Therefore,

the ALJ found that Galbreath was not disabled through the date of the decision. *Id.*

## Review

Galbreath raises several issues on appeal.[9] The Court finds that the ALJ's decision was not sufficient in its consideration of Galbreath's degenerative disk disease. Further, the ALJ's finding that Galbreath was in noncompliance with prescribed treatment was erroneous, and his credibility assessment was not adequate. Reversal and remand for further consideration is required by these issues.

There was medical evidence that Galbreath had degenerative disk disease. She complained of increased back pain on May 11, 2009, and a June 25, 2009 MRI showed mild canal stenosis and neural foraminal narrowing that was moderate on the right side and moderate to severe on the left side. (R. 383-89). On the same day as the MRI, Galbreath described "shock-like" pain that radiated down her left leg. (R. 371). Galbreath also testified that back pain made it difficult for her to walk or to sit for long periods of time. (R. 34, 42, 44-45).

Despite the objective medical evidence in addition to Galbreath's subjective testimony, the ALJ did not include any reference to back pain or degenerative disk disease in his discussion

---

[9]The Court notes that Galbreath's brief did not make the issues in this case clear. Plaintiff's Opening Brief, Dkt. #11. Counsel made vague statements of error, followed by a citation to a regulation, with very little analysis or explanation of how the regulation illustrated that the ALJ had erred. Given the lack of specific arguments with citations to case law accompanied by explanation of how that case law or the cited regulations showed error, the Court considered affirming due to a finding that Galbreath's arguments were "perfunctory" and had been waived. *See Wall v. Astrue*, 561 F.3d 1048, 1066 (10th Cir. 2009) ("perfunctory" arguments deprived the district court of the opportunity to analyze and rule on an issue). The Court ultimately decided that the issues discussed in this Order were sufficiently developed to merit consideration and that they required reversal. The Court urges counsel, however, in future briefing to more fully develop the arguments with analysis, reasoning, and discussion of regulations and case law, so that those arguments will not be susceptible to a finding that they are perfunctory.

of Galbreath's severe and nonsevere impairments at Step Two.  (R. 11).  In his review of the

medical evidence, he noted the results of the June 2009 MRI.  (R. 14).  He then stated the

following:

> [Galbreath] does have some degenerative disk disease, but its nature does not
> substantiate her self-described restriction of walking to only a block.  There are no
> reports of radiculopathy or diabetic neuropathy to account for her alleged leg pain.

(R. 15).  The Court finds that these statements are not supported by any evidence.  There is no

medical evidence regarding what the functional consequences of Galbreath's disk disease are.

The ALJ's statement that there are no reports of radiculopathy is patently incorrect, given that

Galbreath described radiculopathy at her June 25, 2009 appointment.  There is no medical

evidence that contradicts Galbreath's report of radiculopathy.  The reports of Dr. Boyd, Dr.

Wainner, and Dr. Fiegel all were completed before the June 2009 MRI, and those doctors

therefore did not have this objective medical evidence of degenerative disk disease available for

their consideration.  Given this, the ALJ's failure to include degenerative disk disease as a severe

impairment was erroneous.  The ALJ also gave no legitimate reason for dismissing Galbreath's

claims that her back problems impaired her ability to stand, walk, and sit.  These errors require

that this case be reversed and remanded so that the ALJ can properly consider the medical and

subjective evidence regarding Galbreath's degenerative disk disease.

While reversal is required on the issue of degenerative disk disease alone, the Court notes

that the ALJ's use of noncompliance with prescribed treatment as one basis for his decision was

also erroneous.  The ALJ cited to 20 C.F.R. § 404.1530(a) and § 416.930(a) in stating that a

claimant must follow prescribed treatment if it can restore the claimant's ability to work.  (R. 15).

The ALJ then stated that Galbreath had "taken no serious effort to reduce her weight, a major

contributor to her health issues."  *Id.*  The Tenth Circuit has made clear that the cited regulations

can only be used as justification for denying benefits if four elements are met. *Teter v. Heckler*, 775 F.2d 1104, 1107 (10th Cir. 1985). Here, the ALJ did not discuss any of the four required elements. Also, while the ALJ stated that Galbreath had taken no serious effort to reduce her weight, the medical records show that Galbreath reported to her health care providers on several occasions in 2009 that she had been taking short walks and eating healthy meals. (R. 269, 276, 371). Therefore, Galbreath's case does not appear to meet the required element that the prescribed treatment must be refused by the claimant.

Finally, ALJ did not make an adequate assessment of Galbreath's credibility. Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2001). The ALJ must set forth "specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 96-7p, 1996 WL 374186 at *4; *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (in evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence).

> While a claimant's credibility is generally an issue reserved to the ALJ, the issue is reviewable to ensure that the underlying factual findings are "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."

*Swanson v. Barnhart*, 190 Fed. Appx. 655, 656 (10th Cir. 2006) (unpublished), *quoting Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (further quotations omitted).

Here, the ALJ's credibility assessment appears to have consisted of his statements that Galbreath's medical issues "revolve around her obesity" together with his finding that Galbreath

has made no "dedicated effort to reduce her weight." (R. 14). He also included the statements, discussed above, regarding his discounting of her complaints related to her degenerative disk disease. Neither of these is a sufficient reason for a finding that Galbreath is less than fully credible, and neither is supported by substantial evidence. As discussed above, the ALJ's view regarding Galbreath's failure to reduce her weight is undercut by the evidence that Galbreath was attempting to exercise and to follow a healthy diet. There is no evidence that supports the ALJ's view that Galbreath's degenerative disk disease could not have resulted in functional limitations or radiating leg pain.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 27th day of January, 2012.

Paul J. Cleary
United States Magistrate Judge